UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DAVID L. LONGSIO,                                    CIVIL NO.  09-920 (JMR/JSM)

      Plaintiff,

v.                                                    <u>REPORT AND RECOMMENDATION</u>

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 6] and defendant's Motion for Summary Judgment [Docket No. 9]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    FACTUAL BACKGROUND

Plaintiff David Longsio applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423, on October 12, 2004. Tr. 79. Plaintiff claimed he became disabled as of January 31, 1999. <u>Id</u>. Plaintiff alleges that the conditions that limit his ability to work are back problems, left and right knee surgery, and a hand with a severed nerve. Tr. 87.

The Social Security Administration ("SSA") denied plaintiff's application initially and upon reconsideration. Tr. 57, 69. Plaintiff filed a request for a hearing and on November 30, 2006, a hearing was held before Administrative Law Judge ("ALJ") Jerome J. Berkowitz. Tr. 39, 209. Testimony was taken at the hearing from plaintiff,

medical expert Dr. Robert Mulhausen, and vocational expert Edward Utities.  Tr. 209.

On March 23, 2007, the ALJ issued a decision unfavorable to plaintiff.  Tr. 36.  The SSA

Council denied a request for further review.  Tr. 4.  The denial of review made the ALJ's

findings final.  42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.

1992); 20 C.F.R. § 416.1481.

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court

pursuant to 42 U.S.C. § 405(g).  The matter is now before the Court on plaintiff's Motion

for Summary Judgment [Docket No. 6] and defendant's Motion for Summary Judgment.

[Docket No. 9].

## II.    PROCESS FOR REVIEW

Congress prescribed the standards by which Social Security disability benefits

may be awarded:  "[t]he Social Security program provides benefits to people who are

aged, blind, or who suffer from a physical or mental disability."  42 U.S.C. § 1382(a);

Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).   The Social Security

Administration shall find a person disabled if the claimant "is unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such

severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."   42 U.S.C. §

1382c(a)(3)(B).  The impairment must last for a continuous period of at least twelve

months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20

C.F.R. §§ 404.1509, 416.909.

## A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994), vacated on other grounds, as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent her from doing past relevant work. If the claimant can perform past relevant work, she is not disabled. The fifth step involves the question of whether the claimant's impairments prevent her from doing other work. If so, the claimant is disabled.

(citing 20 C.F.R. § 416.920).

## B. Appeals Council Review

If a claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982,

416.1467-416.1482.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon a claimant unless the matter is appealed to Federal District Court within 60 days of notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.    Judicial Review

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not

supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. See Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner. In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision.'" Callison v. Callahan, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (citations omitted).

The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite

conclusion.  INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1 (1992); Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, … or because we would have decided the case differently."  Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once a claimant has demonstrated that he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

III.    **DECISION UNDER REVIEW**

A.    <u>Vocational Background</u>

Plaintiff was 55 years old at the amended onset of his disability.  Tr. 39.  He has a greater than high school level education and past relevant work experience as an accountant.  Tr. 39.

B.    <u>ALJ's Findings of Fact</u>

The ALJ concluded that plaintiff was not entitled to Disability Insurance Benefits under §§ 216(i) and 223 of the Social Security Act.  Tr. 45.  The ALJ based this decision on the following findings:

1.    The claimant met the disability insured status requirements of the Act on January 31, 1999, the date the claimant stated he became unable to work, and he continues to meet them through December 31, 2004.

2.    The claimant has not engaged in substantial gainful activity since January 31, 1999.

3.    The claimant is severely impaired by degenerative disc disease of the lumbar spine.

4.    The claimant does not have an impairment, or combination of impairments, that meets or is medically equal to an impairment found in the Listing of Impairments at 20 C.F.R., Subpart P, Appendix 1.

5.    The claimant's testimony regarding the severity of his symptoms and functional limitations, for the period January 31, 1999, through December 31, 2004, is not fully credible due to significant inconsistencies in the record as a whole.

6.    The claimant, January 31, 1999 through December 31, 2004, retained the residual functional capacity to perform a sedentary level of work involving carrying up to ten pounds, sitting for six hours in an eight-hour workday, standing and/or walking for one to two hours in an eight-hour workday, a brief sit/stand option to stretch every 30 minutes, only occasional climbing stairs, bending,

balancing, stooping, or crouching, and no work at unprotected heights or around dangerous moving machinery.

7.    The claimant is 63 years of age, considered an individual of advanced age, he has a greater than high school level education, and past relevant sedentary skilled work as an accountant.

8.    Considering the claimant's residual functional capacity, from January 31, 1999 through December 31, 2004, age, education, and relevant work history, he remained able to perform his past relevant work as an accountant.

9.    The claimant was not under a disability, as defined in the Social Security Act, at any time on or before the date of this decision.

Tr. 45-46.

## C.    ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step procedure. At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. Tr. 40. At the second step, the ALJ found that plaintiff was severely impaired by degenerative disc disease of the lumbar spine. Tr. 40. However, the ALJ found that he could not consider plaintiff's shoulder impairments, knee impairments, and hand impairments to be severe impairments as defined in the regulations. Tr. 40. At the third step, the ALJ determined that plaintiff did not have an impairment, or combination of impairments, that met or equaled the criteria of any listed impairment. Tr. 41. At the fourth step, the ALJ found that plaintiff had the residual functional capacity to perform his past relevant work as an accountant. Tr. 44.

## IV.    ISSUES UNDER REVIEW

The ALJ determined that plaintiff maintained the following residual functional capacity ("RFC"):

Considering all of the evidence of record, including the testimony presented at the hearing, the undersigned concludes that for the period currently being adjudicated (i.e. January 31, 1999 through December 31, 2004), the claimant retained the residual functional capacity to perform a sedentary level of work involving carrying up to ten pounds, sitting for six hours in an eight-hour workday, standing and/or walking for one to two hours in an eight-hour workday, a brief sig/stand option to stretch every 30 minutes, only occasional climbing stairs, bending, balancing, stooping, or crouching, and no work at unprotected heights or around dangerous moving machinery.

Tr. 41.

Plaintiff challenged the ALJ's determination of his RFC to the extent it found that plaintiff could perform his past relevant work as an investment accountant. Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl. Mem."), p. 18. In particular, plaintiff asserted that the ALJ's credibility finding was not supported by substantial evidence on the record as a whole and did not comply with the requirements of Polaski v. Heckler, 739 F. 2d 1320 (8th Cir. 1984), because the ALJ failed to take into account any pain-related limitations on plaintiff's ability to concentrate and sustain focus on work-related tasks when determining his RFC. Id., p. 21; Plaintiff's Reply to Defendant's Memorandum in Support of Summary Judgment ("Pl. Reply Mem."), p. 10 ("Objective evidence and medical expert testimony show impairments consistent with pain that limits the ability to concentrate. Mr. Longsio suffers prolonged flares of severe pain. His activities do not show the ability to sustain concentration at a very high level, as required by his past work. The record as a whole is consistent with pain causing impairment of concentration that would preclude performance of highly skilled work on an ongoing basis; the ALJ's findings to the contrary cannot be sustained.").[1]

_____

[1]    At first blush, the Court believed that plaintiff was also challenging the ALJ's determinations that plaintiff could sit for 6 out of 8 hours, when plaintiff had testified that

## V.    PLAINTIFF'S RFC

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments.  See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).   The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  However, it is the claimant's burden, not the Commissioner's, to prove the RFC.  Pearsall, 274 F.3d at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  Id.

With these precepts in mind, the Court now proceeds with its analysis of the record as it bears on plaintiff's impairments both before and after January 31, 1999 through December 31, 2004.

### A.    Medical Record

On March 10, 1996, plaintiff underwent knee surgery, with a postoperative diagnosis of left knee partial medial meniscectomy and patellofemoral shaving with removal of medial plical band.  Tr. 153.

On October 23, 1997, plaintiff was seen by Dr. William Himango at St. Luke's Hospital because of back and left lower extremity pain.  Tr. 158.  Plaintiff indicated that

---

he could only sit about half the time, and that plaintiff could meet the attendance requirements for an accountant.  See Pl. Mem., pp. 26-27.  However, based on both plaintiff's and defendant's submissions, the Court has concluded that the sole issue presented by plaintiff's challenge to the RFC was the ALJ's determination that the record did not support his allegations of significant deficits in concentration, persistence and pace.  Tr. 43.

he first noticed the onset of back pain after changing a tire when he was in his 20s, and then experienced occasional pain and eventually felt significantly improved. Tr. 158. In January of 1997, plaintiff noticed intense left lower extremity pain that would generally be present in the morning and then resolve itself. Tr. 158. Plaintiff saw a chiropractor who may have given him relief, but a stretching program increased his pain. Tr. 158. Plaintiff reported that his back pain was now severe, and that he absolutely could not lead a normal lifestyle. Tr. 158. Dr. Himango observed that plaintiff's MRI scan demonstrated a large disc extrusion at the lumbosacral interspace, and an L4-5 disc protrusion impinging on both exiting L-5 roots, and a very small protrusion at L-3. Tr. 159.

On October 27, 1997, Dr. Himango performed a partial hemilaminectomy L5 on the right for the removal of a large extruded disc, a partial himilaminectomy L5 on the left with the removal of a very large freely extruded disc fragment, and a partial hemilaminectomy L4 on the left and exploration of the L5 root. Tr. 160. On October 28, 1997, plaintiff reported that his leg pain was completely gone, and it was noted that he was making excellent progress. Tr. 163. On October 29, 1997, it was again noted that plaintiff had no leg pain and was doing very well. Tr. 163.

Plaintiff was seen at P.S. Rudie and Associates on June 14, 2000 for evaluation of right shoulder pain. Tr. 176. A month prior, he had been building a deck and began having numbing shoulder discomfort; he then fell through the deck and caught himself with his right arm, which was forcibly abducted. Tr. 176. Since then, he had tenderness and pain after activities. Tr. 176. The shoulder sometimes kept him awake at night and he was significantly sore for three days after recently playing golf. Tr. 176. Plaintiff was

observed to be in no acute distress, and his right shoulder had normal flexion and extension, and was able to completely abduct with pain after 90 degrees. Tr. 176. Plaintiff had tenderness over the anterior shoulder biceps tendon and enterior half of the deltoid. Tr. 176.

On September 22, 2000, plaintiff visited P.S. Rudie and Associates for a preoperative physical exam prior to undergoing right knee arthroscopy for a torn meniscus. Tr. 176.

On August 23, 2000, plaintiff's right shoulder was examined. Tr. 167. His shoulder joint appeared normal and there was no evidence of a demonstrated rotator cuff tear. Tr. 167.

On September 28, 2000, plaintiff underwent a right knee arthroscopy, partial medial meniscectomy, and his right shoulder was injected with Marcaine/Kenalog.[2] Tr. 205.

Plaintiff was seen at P.S. Rudie and Associates on April 9, 2003 for evaluation of back pain. Tr. 175. A couple of weeks before this visit, plaintiff had been raking and then lifted a television, and two days later had pain in his mid-back and could barely get out of bed for two or three days. Tr. 175. The pain was improved but plaintiff still had occasional twinges and muscle spasms, and was generally uncomfortable. Tr. 175. Plaintiff was walking the previous day and began having pain down his legs. Tr. 175. It was noted that plaintiff was not in acute distress and seemed to move quite well. Tr.

---

[2] Marcaine is a local or regional anesthetic and Kenalog is a steroid formulation indicated as therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in acute gouty arthritis, acute and subacute bursitis, acute nonspecific tenosynovitis, epicondylitis, rheumatoid arthritis, synovitis or osteoarthritis. http://dailymed.nlm.nih.gov/dailymed/drugInfo

175. Examination revealed that plaintiff's spine was straight, he had paraspinous muscle tenderness in the upper lumbar and low thoracic area on the right, and he had normal reflexes and strength distally. Tr. 175. Plaintiff was given ibuprofen and Flexeril[3] for the spasms and told to follow up if he was not better. Tr. 175.

On July 25, 2004, plaintiff was seen in the Emergency Department at St. Luke's complaining of significant back pain for the last number of days and reported lying on his back at home and using a cane to help support himself. Tr. 168. Plaintiff rated his discomfort as a 10 out of a scale of 10. Tr. 168. Plaintiff was given Toradol,[4] morphine and Phergan, and seemed to do quite well, ambulating with minimal discomfort and diminished pain. Tr. 168. At discharge, plaintiff was prescribed morphine tablets and Flexeril. Tr. 168.

Plaintiff was seen at P.S. Rudie M.D. and Associates on July 30, 2004, complaining of severe left low back pain, and reporting that for about two-and-a-half weeks he could barely move and was crawling around his home. Tr. 174. Plaintiff reported that his pain was significantly better and he was able to start walking the previous day. Tr. 174. Plaintiff was worried about another ruptured disc, and walked and moved slowly but had normal gait. Tr. 174. Examination revealed mild spinal tenderness at approximately L4-5, L5-S1 as well as paraspinous muscle tenderness just to the left. Tr. 174.

---

[3] Flexeril is a brand name for cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds.

[4] Toradol is a brand name for ketorolac, which is used to relieve moderately severe pain, usually after surgery. http://www.nlm.nih.gov/medlineplus/druginfo/meds.

Plaintiff was seen by P.S. Rudie, M.D. and Associates on August 10, 2004. Tr. 173. Plaintiff requested the same morphine he received at St. Luke's, and the prescription was called in. Tr. 173. Plaintiff reported that physical therapy had not ever helped him before, and he was slightly better. Tr. 173.

On September 16, 2004, plaintiff was seen at Kenwood Chiropractic for moderate lower back, hip, buttock and intermittent leg symptoms. Tr. 184. Plaintiff explained he had difficulty standing or forward bending repetitively, and lying down at night sleeping sometimes bothered him, although light walking and stretching offered temporary, partial relief. Tr. 184. Plaintiff noticed no specific weakness into the lower extremities but an achiness and numbing from time to time. Tr. 184. The medication prescribed in March and April of 2004 was only helping to some degree. Tr. 184. On examination, plaintiff had a forward and right antalgic lean; tenderness was noted as a grade 2 at levels L3-4-5 and the sacal iliac region on a scale of 0-4 tenderness to palpation. Tr. 184. A grade 2 bilateral lumbo sacral paraspinal muscle spasm was noted on a scale of 0-4 scale of spasm to palpation. Tr. 184. Plaintiff noticed localized lumbo sacral and hip and buttock area pain on orthopedic testing. Tr. 184. On neurologic evaluation, the lower extremity reflex, sensation and motor power testing was within normal limits and equal bilaterally. Tr. 184. Plaintiff was diagnosed with lumbar spine sprain/strain with possible disc involvement, and intermittent lower extremity pain and numbing. Tr. 184. The treatment plan was to try a series of 4-8 visits over the next few weeks. Tr. 185. On September 20, 2004, plaintiff continued to notice lower neck, trapezius and mid scapular discomfort, including left upper extremity pain and numbing. Tr. 185. However, it did not appear to be as sore and painful as the

previous week, and plaintiff stated that he had some relief following the treatment at the previous visit and a more restful sleep. Tr. 185. Tenderness and spasm were still noted. Tr. 185.

An MRI of plaintiff's lumbar spine was taken on December 8, 2004. Tr. 180. The MRI revealed slight progression of endplate degenerative changes at L3-4, L4-5 and L5-S1, with somewhat prominent endplate osteophyte formation at each level; marked disc height loss and desiccation at the L4-5 and L5-S1 inteverterbral discs; and a new small Schmort's node involving the inferior endplate of the L4 vertebral body anteriorly. Tr. 180. L5-S1 also demonstrated moderate endplate osteophyte formation, and endplate spurring demonstrated mass effect on the dural sac, with suspicion for mass effect on the right S1 nerve root. Tr. 180. L-4-5 demonstrated a new protrusion that markedly narrowed the right lateral recess and likely compressed the right L5 nerve root, and a diffuse bulging annulus was appreciated. Tr. 180. L3-4 also demonstrated a diffuse annular bulge, which was progressed since the prior examination. Tr. 180. L2-3 also demonstrated a diffuse annular bulge with a small right paracentral annular tear, associated with a small broad-based protrusion. Tr. 180. The conclusion was that there were postsurgical changes at L4-5 and L5-S1, now with a right paracentral protrusion at L4-5, compressing the right L5 nerve root as it exited the dural sac. Tr. 180. There was also a question of mass effect on the left L5 nerve root at that level secondary to diffuse annular bulging. Tr. 180. It also observed marked endplate spurring at L5-S1 with a focally prominent, somewhat nodular osteophyte demonstrating encroachment on the spinal canal, raising suspicion for mass effect on the right S1 nerve root sleeve, but there was no distinct evidence of nerve root compression. Tr.

181.  There was severe spinal canal stenosis at L3-4 secondary to worsening diffuse annular bulge and bilateral facet arthropathy, and severe spinal canal stenosis at L2-3 secondary to diffuse bulge and right paracentral annular tear; the bulging annulus had also progressed since the previous examination.  Tr. 181.

On January 3, 2005, plaintiff underwent a consultative examination by Dr. Franklin Johnson in connection with his application for social security disability benefits. Tr. 186.  Dr. Johnson noted that plaintiff obtained some relief after his surgery in 1997, but because of increasing distress and pain, chose to retire in January of 1999.  Tr. 186. Dr. Johnson reported that since then, plaintiff demonstrated an extremely careful lifestyle, avoiding golf, fishing, and cutting the grass because he was fearful of an acute episode of pain.  Tr. 186.  He observed that after plaintiff's emergency room visit in July of 2004, plaintiff recovered but went back to a period of chronic discomfort and adopted an extremely careful lifestyle to avoid incapacitation.  Tr. 186.  Plaintiff reported that he was periodically uncomfortable but had not repeated the acute severe episode from the previous summer.  Tr. 186.  Dr. Johnson noted plaintiff's bilateral knee symptoms that required arthroscopic surgery and resulted in good relief of symptoms both on the right and the left, and right hand surgery during which a nerve was severed, giving him some mild palm anesthesia and weakness.  Tr. 186.

Dr. Johnson's evaluation revealed that plaintiff did not appear uncomfortable during the examination, and that he sat erect on the examining table.  Tr. 187  Plaintiff had a good and normal range of motion in his neck, normal range of motion in his upper extremities, and above average muscular development of shoulders and upper arms. Tr. 186-187. Plaintiff had subjective symptoms, but no absolute anesthesia in his left

hand, and an area of hip aesthesia in the palm of his right hand with excellent coordination and grip strength.  Tr. 187.  Plaintiff had no significant loss of function in his upper extremities.  Tr. 187.  Plaintiff was able to lie back on the examining table and hold his legs off the table; straight leg raising was positive at 30 degrees but was not severely uncomfortable; knees and hips had normal range of motion without heat, inflammation or deformity in the ankles or knees.  Tr. 187.  Plaintiff exhibited neither dorsiflexion weakness nor any hard neurological radicular findings.  Tr. 187.  Plaintiff was able to walk a couple of blocks, with the limiting factor being back pain, and not joint problems.  Tr. 187.  Plaintiff had excellent balance, and standing in an erect position, could carefully bend forward to 70 degrees, and laterally 15 degrees to the right and left.  Tr. 187.

Dr. Johnson's impression was post laminectomy for lumbar spine protusion, moderate to good recovery with recurrent episodes of exacerbation of discomfort in pain.  Tr. 187.  Dr. Johnson noted that plaintiff demonstrated a variety of limitations such as bending, lifting, and sitting for prolonged periods of time, and had back impairment and incapacitation, which would be less crucial in his line of work than that of a laborer.  Tr. 187.  Dr. Johnson noted that plaintiff would be due conventional Social Security compensation in approximately five months, and indicated that even if plaintiff "were of a more comfortable nature, he would probably, at this time in his life, opt not to return to the work place after a successful 32 year career."  Tr. 187.

On January 11, 2005, plaintiff was seen by the neurologist, Dr. Himango, who had performed the surgery on his back in October 1997.  Tr. 188.  Plaintiff told Dr. Himango that he had experienced an excellent result following that surgery, but that

approximately two years ago he had begun to suffer right lower extremity pain that would extend down his right leg.  Tr. 188.  Plaintiff indicated that once he had to crawl on the floor for up to 13 days because of severe low back pain, and described profound episodes of back pain which had occurred during the summer of two successive years. Tr. 188.  Dr. Himango asked whether plaintiff led a normal lifestyle.  Tr. 188.  Plaintiff stated that there were times he could lead a normal lifestyle, and other occasions when it was very difficult.  Tr. 188.  On examination, Dr. Himango reported that plaintiff exhibited normal gait, heel and toe walking were normal, and straight leg raising was minimally positive bilaterally at 70 degrees and caused low back discomfort.  Tr. 189. Reflexes at plaintiff's knees were normal and symmetric.  Tr. 189.  Plaintiff's lumbar MRI revealed degenerative changes throughout the lumbar spine with moderate spinal stenosis.[5]  Tr. 189.  Dr. Himango's impression was that plaintiff's history was consistent with sequelae of degenerative arthritic changes throughout his lumbar spine; plaintiff was not a surgical candidate, but if at some time he were to develop progress stenosis leading to neurogenic claudication,[6] further options might be considered.  Tr. 189.  Dr. Himango advised plaintiff to make every attempt to maintain an optimal state of physical

---

[5]     Spinal stenosis causes narrowing in the spine. The narrowing can occur at the center of the spine, in the canals branching off the spine and/or between the vertebrae, the bones of the spine. The narrowing puts pressure on nerves and spinal cord and can cause pain.
http://www.nlm.nih.gov/medlineplus/spinalstenosis.html

[6]     Usually in association with lumbar spinal stenosis; a condition caused by ischemia of the muscles, characterized by attacks of lameness and pain.  Stedman's Medical Dictionary (27th ed. 2000).

fitness, and indicated that arrangements could be made for plaintiff to be evaluated by a physiatrist, if plaintiff so desired.[7]  Tr. 189.

###### B.    Daily Activities

In a function report completed on November 4, 2004 in connection with his application for social security benefits, plaintiff stated that his daily routine involved making breakfast, reading, watching television, taking short walks, following the stock market, and preparing his evening meal.  Tr. 116.  Plaintiff also cared for his dog.  Tr. 117.  Plaintiff stated that he had to be careful in most everything he did or his symptoms and back pain would reappear.  Tr. 117.  Certain movements affected his sleep because they brought on pain.  Tr. 117.  When plaintiff's back went out it was very difficult to provide personal care for himself.  Tr. 117.  Plaintiff prepared sandwiches and simple meals for himself daily, and it took him about 5 to 10 minutes, but when his back when out it was difficult to think of cooking.  Tr. 118.  Plaintiff did some house cleaning and laundry, but on occasion hired a girl to clean his house and another person to cut his grass, and his neighbors helped with any heavy work.  Tr. 118.  Plaintiff did cleaning and laundry once per week.  Tr. 118.  When he overdid house or yard work, his back began to spasm.  Tr. 119.  Plaintiff went outside almost daily for short walks, and traveled by walking and driving a car.  Tr. 119.  He shopped for groceries in stores for about an hour every two to three weeks.  Tr. 119.  Plaintiff paid his own bills, counted change, handled a savings account, and used a checkbook, and his ability to handle money had not changed since his back condition began.  Tr. 119.  Plaintiff's hobbies and interests were reading, watching television, reviewing the stock market and fishing

---

[7]     There is no indication in the records that plaintiff followed through with seeing a physiatrist.

off of his dock.  Tr. 120.  He did these things daily except when his back was out, and then he was bedridden or on the floor.  Tr. 120.  He has to read and watch television in an elevated hard chair and could not lie on the couch.  Tr. 120.

For social activities, plaintiff played cards, took walks, talked on the phone and emailed; about one night a week during the winter he played cribbage.  Tr. 120.  Occasionally he needed to be driven to play cards when he had back problems.  Tr. 120.  He had not golfed in three or four years, and most social activities had ceased, since his back problems began.  Tr. 121.  Plaintiff indicated that his back pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, and concentrate, stating "all of the above are very difficult when you have back pain."  Tr. 121.  Plaintiff stated he could walk two blocks before needing to stop and rest for one to two minutes.  Tr. 121.  He indicated he could pay attention for quite a while, finished what he started, followed written instructions relatively well, and was fine at following spoken instructions.  Tr. 121.  Plaintiff handled stress and changes in routine well.  Tr. 122.  He used crutches and glasses or contact lenses; the crutches were prescribed when he had his knee surgeries, and he used them when he was taken to the emergency room for his back problems.  Tr. 122.

In a disability report dated October 4, 2006, plaintiff stated that when his back locked up, he could not do much, and that it had happened about three times that year.  Tr. 107.  From July to October, he stated he was homebound and his neighbors did everything for him; he could do very little and spent most of his time lying on the floor for three weeks.  Tr. 107.  Plaintiff was careful because he did not want that to happen again, and avoided lifting and changed positions often.  Tr. 107.  Plaintiff stated that he

got out more at the time of the report than he did in October and played cribbage on Wednesday nights. Tr. 107. Plaintiff indicated that he was taking aspirin and ibuprofen for his condition. Tr. 106. He last saw his primary physician, Dr. Woodrich, on October 29, 2004, and the neurologist, Dr. Himango, on January 2005. Tr. 105.

Sharon Moe, a neighbor of plaintiff, wrote a letter dated September 15, 2006, on plaintiff's behalf. Tr. 124-27. Moe stated that in the spring of 2004, plaintiff came into a restaurant at which she and her husband were eating; he appeared to have lost weight and he would wince if he stood upright. Tr. 124. Plaintiff said he had been having trouble with his back, and that he had spent some time in the hospital; he had not been eating much because he could not easily cook for himself because of his back. Tr. 124. Moe made a massage appointment for plaintiff and went to pick him up; plaintiff seemed in pain and Moe put his shoes on for him. Tr. 125. It was painful for plaintiff to get down his steps and walk to Moe's car, and difficult for him to get in the car. Tr. 125. It then took some time for plaintiff to get inside the masseuse's office. Tr. 125. When Moe returned to pick up plaintiff, he was smiling and able to slowly put his shoes on and walked more relaxed. Tr. 125. The next spring, Moe helped plaintiff put in his flower garden because he culd not bend without pain. Tr. 126.

Dennis O'Brien, another neighbor and friend of plaintiff's, wrote a letter dated September 19, 2006. Tr. 128. O'Brien stated that plaintiff was in such pain that he was living on the floor of his home; O'Brien brought him things from around the house that he needed, and watched plaintiff painfully crawl to the bathroom. Tr. 128. O'Brien also did plaintiff's grocery shopping during this time. Tr. 128. Plaintiff lived like that for weeks until friends persuaded him to let them bring him to the hospital. Tr. 128.

Toni Samskar, a friend of plaintiff's, wrote a letter dated September 20, 2006 in which she stated that she visited plaintiff in August of 2004, and he was in too much pain to sit or walk and was lying on the floor.  Tr. 129.  Samskar helped with his grocery shopping.  Tr. 129.

Mary Rothe, a friend of plaintiff's, submitted a letter dated September 21, 2006.  Tr. 130.  Rothe met plaintiff in 1999, and since she had known him, he had complained of back problems.  Tr. 130.  In the summer of 2004, plaintiff was experiencing more back pain than usual; one day she went to visit him and he told her he had been on the floor for nine days, so she took him to the emergency room.  Tr. 130.

## C.  RFC Assessment

A residual functional capacity assessment was performed on January 11, 2005 by a state agency physician, and affirmed on October 3, 2005.  Tr. 191-198.  Plaintiff was determined to be able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk with normal breaks about 6 hours in an 8-hour workday, sit with normal breaks for a total of about 6 hours in an 8-hour workday, and had unlimited push and pull capability.  Tr. 192.  Plaintiff had excellent grip strength, no tremor, straight leg raising to 30 degrees without it being severely uncomfortable, and no dorsiflexion weakness.  Tr. 192.  Regarding postural limitations, plaintiff could frequently climb ramps, stairs, ladders, ropes and scaffolds and balance, and occasionally stoop, kneel, crouch and crawl.  Tr. 193.  No manipulative, visual, communicative or environmental limitations were established. Tr. 194-195.  Plaintiff's symptoms were attributable to a medically determinable impairment, the severity and duration of the symptoms was not disproportionate to the expected severity and

duration, and the severity of the symptoms and their alleged effect on function was consistent with the medical and nonmedical evidence.  Tr. 196.

### D.    Hearing Before The Administrative Law Judge

Plaintiff appeared at the hearing before Administrative Law Judge Jerome Berkowitz on November 30, 2006.  Tr. 209.  Plaintiff testified that he was not married and lived by himself in a house.  Tr. 211.  Plaintiff had a driver's license and drove.  Tr. 212.  On an average day, plaintiff got up at about 7:00 or 7:30 a.m., after which he made coffee and watched television.  Tr. 212.  Plaintiff took care of all of his own personal needs, except he hired some kids to help with outdoor chores like grass cutting and raking.  Tr. 213.  He did not shovel snow, but had someone come and plow.  Tr. 213.  Plaintiff made his own meals and vacuumed, and did some cooking and grocery shopping.  Tr. 213.  Plaintiff's friend worked at the grocery store, and she picked up things for him half of the time.  Tr. 213.  During the day, plaintiff watched television.  Tr. 213.  Prior to July of 2004, plaintiff used to do a lot of golfing and fishing and ice fishing.  Tr. 214.  He seldom fished anymore.  Tr. 214.  Plaintiff occasionally went out to eat.  Tr. 215.  He had traveled to Jamaica five or six years ago, and the Dominican Republic three years ago.  Tr. 215.  Plaintiff used to be in a cribbage league, but after he started having back problems, he stopped because he would have to get a substitute if he could not go, or if he could go, his partner had to pick him up.  Tr. 215.  Additionally, instead of moving from table to table, plaintiff had to stay in one spot.  Tr. 215.  Plaintiff belonged to the Elk's Club, which he joined a year ago, but had not been there for about eight months.  Tr. 215-216.  In the evenings, plaintiff watched television,

and went through his investments. Tr. 216. Plaintiff also had a dog who was his companion. Tr. 216.

Plaintiff testified that he did not sleep well at night because he back hurt a little bit and he was never a very good sleeper. Tr. 216.

Plaintiff retired in January of 1999 because he was hurting on the job. Tr. 217. He sat on a stool and he would have to get up and down and it began to bother him so much that he could not think straight. Tr. 217. Plaintiff worked on his employer's investment portfolio and his job required accuracy and he could not afford to make mistakes. Tr. 217. His work was published in annual reports and 10Ks, 10Qs and stockholder information that required accuracy. Tr. 222. His boss wanted plaintiff to stay on and even offered him a promotion, but plaintiff told him his back was driving him crazy and he could not handle it, and he retired. Tr. 217.

When asked by the ALJ why he could not do a job where he could get up and stretch and then sit down again, plaintiff stated that he could probably do it, but he felt that being in one position all day just bothered him; he had to get up and then at times lay on the floor in his cubicle. Tr. 217. Plaintiff said he could get up and walk, but when he was hurting it was hard to concentrate. Additionally, while he had to get up and walk every 10 minutes, plaintiff did not think he was not doing his job right. Tr. 218.

Plaintiff tried therapy and chiropractics which did not do anything. Tr. 218. His surgery eventually made the pain better. Tr. 218. His doctors told him not to lift heavy things, but he believed he could lift 20 pounds at least occasionally. Tr. 219. Plaintiff could usually sit for about a half-hour before he had to get up and move around. Tr. 219. Plaintiff was not as flexible as he used to be, but could stand, squat, and climb

stairs at least occasionally.  Tr. 220.  Plaintiff had back pain somewhat all the time, and it varied greatly; it was in his low back but radiated down into his right leg and into his toes and fingers.  Tr. 220-221.  Plaintiff's pain was usually about a three or four on a scale of one to ten, with one being a little annoying and ten being the worst pain imaginable.  Tr. 221.  The pain was not usually better than that, but about three or four times a year it was much worse at a nine or ten.  Tr. 221.  When that happened, it lasted anywhere from a week or two to six months.  Tr. 221.

Plaintiff testified he took ibuprofen and aspirin for the pain, but when he had the severe back pain, he took morphine.  Tr. 222.  Plaintiff also testified that he would have kept his job if he did not have the back condition as he was at his peak earning time.  Tr. 222-23.  It cost him a 32% reduction in his pension to retire early, and he loved his job.  Tr. 223.  Plaintiff did not think that he would have been able to do another job that involved the same kind of skills.  Tr. 223.  He left the job because he was hurting.  Tr. 223.

Plaintiff's surgery in 1997 improved his back pain symptoms on his left side, but he then experienced symptoms on his right, and things became much worse in 2004.  Tr. 224.  Plaintiff's severe back pain episodes began in 2004, occurred three to four times a year, and each occurrence usually lasted two to three weeks.  Tr. 225.  Between those episodes, plaintiff could sit down and then get up, but it was still hard to concentrate because of the pain.  Tr. 225.  During the times of severe pain, plaintiff believed he could not perform a job eight hours per day because during those periods of exacerbation, he did not do anything and he laid on the floor if it was really bad.  Tr. 225.

Plaintiff thought he could lift maybe ten pounds one-third of the time if it were required for a job, and could spend about half of his time sitting and half of his time standing during eight hours if he were able to get up whenever he needed to. Tr. 226-227.

When he was working as an accountant, plaintiff did a good job, did not mistakes, and his boss did not have a problem with his work. Tr. 228. However, plaintiff had trouble focusing and concentrating the way he felt he should. Tr. 228-229. When his pain became severe, he could not concentrate. Tr. 229. His employer asked him if he would like to do something other than what he was doing, but plaintiff did not believe that changing jobs would have solved the problem. Tr. 228.

Medical expert Dr. Robert O. Mulhausen testified at the hearing. Tr. 229. Based on his review of the medical evidence, Dr. Mulhausen determined plaintiff was limited to sedentary work which he defined as lifting up to ten pounds of weight, sitting six out of eight hours with at will standing and stretching, occasional lifting, bending, stooping, climbing, crouching and crawling, and avoidance of hazards, machinery and heights. Tr. 231. Dr. Mulhausen indicated that the only documentation of incapacitation for a long period of time was plaintiff's episode in 2004, and that episode would require less than the sedentary RFC Dr. Mulhausen gave. Tr. 232. Dr. Mulhausen also stated that although the 2004 occurrence was the only episode with significant documentation, plaintiff did give a consistent history of recurring episodes. Tr. 231-232. Additionally, Dr. Mulhausen testified that plaintiff's medical condition shown in the MRI was consistent with the pattern of flares described by plaintiff. Tr. 232.

Vocational expert ("VE") Edward Utities testified at the hearing as well.  Tr. 232-233.  The ALJ provided the VE with the following hypothetical:

> Assume a 61 to 63-year-old male with a college degree, and work experiences outlined by yourself and your important testimony, who's impaired by degenerative disc disease with low back pain.  He is status post-surgery.  Takes no medication that would cause work-related side effects.  Let's give him a ten pound weight restriction.  Sit six of eight.  Stand and walk one to two.  I would give a brief sit/stand to stretch maybe every 30 minutes before resuming any sitting.  Occasional bending, stairs, balancing, stoop, crouching kind of activities.  No unprotected heights, dangerous moving machinery.

Tr. 233.

Based on this hypothetical, the VE testified that plaintiff's past relevant work as an accountant would fall within the parameters of the hypothetical.  Tr. 233-234.  The ALJ then provided a second hypothetical which included everything in the first hypothetical, but added that plaintiff could stretch for a minute or so whenever he felt the need – i.e. the ability to stretch at will.  Tr. 234.  The VE testified that this modification would not impact his finding – his opinion was that plaintiff's work was a professional position where a person would have flexibility to get up and move around periodically and stretch for short periods.  Tr. 234.

Plaintiff's attorney then adjusted the hypothetical, and asked the VE what the effect of an inability to tolerate prolonged sitting would have on the VE's opinion.  Tr. 234.  The VE testified that it would normally be expected with the vast majority of accountants that they would be expected to sit for six hours of eight, and plaintiff testified that he could sit for half and stand for half of an eight hour day.  Tr. 234-235.  Plaintiff's attorney next asked the VE what if plaintiff was in such severe pain that it interfered with his ability to consistently focus on what one was doing.  Tr. 235.  Before

the VE responded, the ALJ stated that he would presume disability if that were the case because an accountant was a high level professional position, and if one could not concentrate on his work, then he obviously could not do it. Tr. 235. Finally, plaintiff's attorney asked the VE what the maximum numbers of unscheduled absences that a competitive employer would permit, and the VE stated that roughly for unskilled work a person could miss up to two days per month. Tr. 235. However, with an individual in a professional position, the VE believed there would be more flexibility, and opined that a person with thirty-plus years of employment would probably be able to miss a month to a month-and-a-half with a combination of sick and vacation time. Tr. 235-236.

## V.    DISCUSSION

Plaintiff alleged that the ALJ's credibility finding was not supported by substantial evidence on the record as a whole and did not comply with the requirements of Polaski. Pl. Brief, p. 19. Specifically, plaintiff claimed that the ALJ's failure to find any pain-related limitation in the ability to concentrate and sustain focus on work-related tasks was not supported by the record as a whole. Id., pp. 20-21.

Failure to give some consideration to a claimant's subjective complaints is reversible error. Brand v. Secretary of the Dept. of Health, Educ. and Welfare, 623 F.2d 523, 525 (8th Cir. 1980). "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding." Id. An ALJ must consider a claimant's subjective complaints, regardless of whether they are corroborated by objective medical findings. Id.; see also Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991). On the other hand, "we will not substitute

our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility." Id. (citing Woolf, 3 F.3d at 1213).

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)). The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1.    the claimant's daily activities;

2.    the duration, frequency, and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness, and side effects of medication; and

5.    functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207.[8]

---

[8]    The Polaski factors are virtually the same factors found in SSR 96-7p, which directs the ALJ to evaluate the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson, 87 F.3d at 1017 (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 207. If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Cline, 939 F.2d at 565.

Here, plaintiff contends that he was unable to perform his past work as an accountant because the pain he experienced from low back problems interfered with his ability to concentrate and focus on his work. The ALJ found otherwise, stating:

> The claimant testified her terminated his employment due to his chronic pain which he felt would limit his ability to concentrate and thus preclude him from accurately performing his job. However, the claimant's testimony indicates that his employer was satisfied with his job performance, even offering him a promotion at the time he terminated his employment. There have been no concerns by the claimant expressed to treating physicians regarding cognitive deficits and his ongoing episodic use of aspirin and Ibuprofen to treat his symptoms of pain, with no requests from for other medications due to adverse side effects, would lead to the conclusion that the claimant was not experiencing side effects from the use of medication which would significantly interfere with his ability to concentrate. Additionally, the claimant's wide range of activities, before December 31, 2004, including the ability to use a computer, play card games, work on stock transactions, and handle his own finances (Exhibit 4E) (sic)[9] are

---

[9]     Based on the Court's review of the record, it is evident that the ALJ was referencing Exhibit 6E (Function Report dated November 4, 2004) at Tr. 116-123, and not Exhibit 4E (Disability Report dated October 5, 2006) at Tr. 104-109.

inconsistent with allegations of significant deficits in concentration, persistence, or pace.

Tr. 43.

The Court agrees with the ALJ's assessment and finds that there is substantial evidence in the record to support the RFC and his conclusion that plaintiff could perform his prior work as an accountant.

First, the ALJ found that the objective medical evidence and plaintiff's course of treatment prior to December 31, 2004 did not support the severity of his allegations. Tr. 41. The ALJ observed that although examinations of plaintiff's back documented spinal tenderness, there were no neurological or sensory deficits, no loss of motor strength and no disturbances in gait. Tr. 41. The ALJ stated that MRI taken in December 2004 showed no distinct evidence of nerve root compression, but did show spinal canal stenosis at the L3-4 and L-3 level. Tr. 41. The ALJ indicated that Dr. Johnson's clinical findings confirmed no hard neurological radicular findings, there was no dorsiflexion weakness or disturbances in gait, and plaintiff was able to hold his legs off the examining table against the force of gravity, could stand in an erect position and could carefully bend forward. Tr. 42 (citing to Exhibit 10F at Tr. 187). The ALJ observed that while the record documented exacerbations of back pain in April 2003, July through August 2004, and December 2004, there was little ongoing treatment for chronic pain since the onset date of January 31, 1999. Tr. 42. The ALJ stated that this lack of medical treatment with no evidence of significant exacerbations of back pain from 1999 through 2003, was inconsistent with plaintiff's claims of incapacitating limitations. Tr. 42.

The Court's review of the medical record does not compel a different conclusion. After plaintiff's back surgery in October of 1997, plaintiff reported no leg pain and it was noted that he was doing very well. Tr. 163. Plaintiff was seen in April of 2003 for evaluation of back pain, and it was noted that he was not in acute distress and seemed to move well, his spine was straight, and his reflexes were normal. Tr. 175. Plaintiff was given ibuprofen and a muscle relaxant and told to follow up if he did not feel better; then, according to the medical record, he was not treated again for back pain until his trip to the emergency room over one year later in July of 2004. Tr. 175, 168. Although plaintiff rated his pain as a 10 out of 10 during the emergency room visit, he did quite well after being given pain medication and was ambulating with minimal discomfort and diminished pain. Tr. 168. Several days later, plaintiff reported that his pain was significantly better, and it was noted that he walked and moved slowly but had normal gait. Tr. 174. In August and September of 2004, plaintiff continued to complain of back pain at which time he was prescribed medication and began to see a chiropractor, who noted that plaintiff was having some relief from the treatments. Tr. 173, 185.

Plaintiff's chiropractic records from August and September of 2004 are the last records regarding any treatment for his back problems. An MRI in December of 2004 revealed postsurgical changes and progression of stenosis, but in January of 2005, plaintiff had a consultative examination by Dr. Johnson during which he stated that he adopted a careful lifestyle and was periodically uncomfortable but had not had another severe episode. Tr. 180, 186. Dr. Johnson noted that plaintiff was not uncomfortable during examination and sat erect on the examining table; he was able to lie back on the examining table and hold his legs off the table; he had normal range of motion in his

neck, upper extremities, knees and hips; straight leg raising was positive at 30 degrees but was not severely uncomfortable; and he had excellent balance and could bend forward and to the right and left. Tr. 187. Dr. Johnson opined that plaintiff had made moderate to good recovery from his back surgery, but had recurrent episodes of pain, and while plaintiff had shown a variety of limitations in his ability to bend, lift, and sit for prolonged periods of time, his back impairment and incapacitation were less crucial in his line of work than that of a laborer. Tr. 187. Recognizing that plaintiff was entitled to conventional social security compensation in five months, Dr. Johnson noted that even if plaintiff were more comfortable, he did not believe that plaintiff would choose to return to the work place after a successful 32-year career and at this time in his life. Tr. 187.

Dr. Johnson's findings were consistent with the report by Dr. Himango, the neurologist who had performed the surgery on his back in October 1997. Tr. 188. Plaintiff saw Dr. Himango on January 11, 2005, at which time he told Dr. Himango that he had experienced an excellent result following that surgery but that in 2003, he had begun to suffer right lower extremity pain that extended down his right leg. Tr. 188. Since that time, plaintiff reported several profound episodes of back pain. Tr. 188. Plaintiff stated that there were times he could lead a normal lifestyle, and other occasions when it was very difficult. Tr. 188. Dr. Himango's examination of plaintiff indicated that he had normal gait and heel and toe walking, was able to lie down and lift his legs off a table, straight leg raising was minimally positive bilaterally, he could bend left and right, and he had excellent balance. Tr. 189.

That was the last time plaintiff had seen a doctor. Tr. 105.

The medical record does not support the severity of plaintiff's allegations or even his stated reasons for his retirement in 1999. The record shows that plaintiff had back surgery in 1997, and received an excellent result such that he did not require any medical attention until 2003, which was six years after the surgery and four years after he had terminated his employment. Further, while the records documented episodes and treatment of back pain in April 2003, July through September 2004 and December 2004, there is no record of ongoing treatment for chronic pain since plaintiff's alleged onset date of January 31, 1999, supporting the ALJ's determination that this lack of ongoing medical treatment and lack of evidence of significant exacerbations of back pain from 1999 through 2003 was inconsistent with plaintiff's claims of incapacitating limitations.

At the same time, the Court observes that the ALJ did incorporate into the RFC Dr. Johnson's opinion that plaintiff's ability to bend, lift, and sit for long periods of time was impaired.

Second, as to plaintiff's treatment for his back problems, the ALJ noted that although plaintiff required narcotic medication to treat an exacerbation of back pain in July of 2004, he has generally controlled his pain with ibuprofen and aspirin, and his ability to function without narcotic medication was not consistent with plaintiff's allegations of disabling limitations. Tr. 42. The ALJ observed that the usage of ibuprofen and aspirin, instead of narcotics, also led to the conclusion that plaintiff was not experiencing side effects from the usage of medication that would significantly interfere with his ability to concentrate. Tr. 43.

The Court agrees with the ALJ's characterization of plaintiff's treatment. The record shows that plaintiff received treatment for his back pain only when it was severe, with no treatment for chronic back pain until September of 2004, when he saw a chiropractor two times. The record also confirms that plaintiff took nothing stronger than over-the-counter medicine unless he was having a severe episode, and sought out no other treatment for his alleged chronic pain, such as an evaluation by a physiatrist as offered by Dr. Himango, or further chiropractic treatments or even a massage, both of which had provided him with some improvement and relief in the past. Tr. 125, 185. This lack of treatment is inconsistent with plaintiff's claims of disabling pain. See Clevenger v. Social Security Administration, 567 F.3d 971, 976 (8th Cir. 2009) (plaintiff's testimony that she only took over-the-counter medications was inconsistent with subjective complaints of pain); Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints."); Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001) (fact that plaintiff took nothing stronger than vitamins and aspirin to alleviate symptoms found to be inconsistent with disabling pain); Barber v. Chater, 94 F.3d 648 (8th Cir. 1996) (sporadic and conservative treatment history coupled with low dosage of pain medication undermined complaints of pain); Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997) (determining that failing to seek treatment was inconsistent with claimant's subjective complaints of disabling pain); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition).

Third, the ALJ examined plaintiff's daily activities, and concluded based on plaintiff's testimony and response to the activities of daily living questionnaire, that on or before December 31, 2004, plaintiff was fairly active throughout the day and performed numerous activities of daily living on a sustained basis that were consistent with the ability to work within the RFC.  Tr. 42.  In this regard, the ALJ indicated that in June of 2000, when plaintiff was treated for right shoulder pain, he reported that a month prior he had been building a deck, and in April 2003, when plaintiff experienced an exacerbation of low back strain, he indicated that a few weeks prior to that incident, he was raking and had lifted a television.  Tr. 42-43.  The ALJ found these activities were not consistent with plaintiff's allegations of disabling pain.  Tr. 43.  The ALJ further observed that despite plaintiff's testimony that he terminated his employment due to chronic pain that would limit his ability to concentrate and accurately perform his job, plaintiff admitted that his employer was satisfied with his job performance and offered him a promotion at the time he terminated his employment.  Tr. 43.  The ALJ also noted that there were no concerns expressed by plaintiff to treating physicians regarding any cognitive deficits, plaintiff had experienced no side effects from his episodic use of aspirin and ibuprofen that would significantly interfere with his ability to concentrate, and his wide range of activities, including ability to use a computer, play card games, work on stock transactions, and handle his own finances, were inconsistent with allegations of significant deficits in concentration, persistence or pace.  Tr. 43.

These findings are supported by the record.  As discussed above, plaintiff reported that his daily routine involved making breakfast, reading, watching television, taking short walks, following the stock market, preparing meals, and caring for his dog.

Tr. 116-18. Plaintiff performed some house cleaning and laundry, drove a car, and periodically shopped for groceries. Tr. 118-119. Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook, and his ability to handle money had not changed since his back condition began. Tr. 119. Plaintiff's hobbies and interests were reading, watching television, reviewing the stock market and fishing off of his dock. Tr. 120. Plaintiff also played cards, took walks, talked on the phone and emailed, and played cribbage. Tr. 120.

Plaintiff indicated that he performed hobbies daily except when his back was out, and then he was bedridden or on the floor. Tr. 120. Plaintiff stated that his back pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, and his concentration. Tr. 121. At the same time, plaintiff also reported that he could pay attention for quite a while, finished what he started, followed written instructions relatively well and was fine at following spoken instructions. Tr. 121.

Consistent with these reports, plaintiff testified at the hearing that he took care of all of his own personal needs, made his own meals and vacuumed, and did some cooking and grocery shopping. Tr. 213. Plaintiff hired some kids to help with outdoor chores like grass cutting and raking. Tr. 213. During the day, plaintiff watched television. Tr. 213. He occasionally went out to eat and had traveled to Jamaica five or six years ago, and to the Dominican Republic three years ago. Tr. 215. In the evenings, plaintiff watched television and went over his investments. Tr. 216.

Plaintiff's lack of complaints to any medical professionals that he was having difficulty concentrating, in conjunction with his description of his daily activities, render his complaints that he is unable to concentrate because of chronic pain, and engage in

substantial gainful employment, less than credible.  Additionally, these allegations of an inability to concentrate because of pain are not borne out by the promotion offered by his employer, his reported activities of emailing, studying the stock market, going over his investments, watching television and reading, or his statements that he could pay attention for quite a while, finish what he started, and follow written and oral instructions.

Finally, the ALJ examined plaintiff's work history and observed that while he had an excellent record of employment, he stopped work due to anticipated problems and made no attempt to return to work or to seek any vocational rehabilitation training to assist with employment.  Tr. 43.  Based on this record, the ALJ concluded that it did not suggest a significant effort to return to work.  Tr. 43.  This finding is also supported by the record.  Plaintiff admitted that following his retirement in 1999, he had made no attempt to return to any work.  Tr. 216.  Indeed, given that plaintiff was only five months away from receiving conventional Social Security benefits, Dr. Johnson predicted that if plaintiff "were of a more comfortable nature, he would probably, at this time in his life, opt not to return to the work place after a successful 32 year career."  Tr. 187.

Plaintiff's employer offered him the opportunity to take a different job, which he turned down.  This conduct detracts from his credibility.  Tr. 228.  See Tuttle v. Barnhart, 130 Fed.Appx. 60, 61 (8th Cir. 2005) ("evidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one"); Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) (concluding that the plaintiff's lack of motivation to work was a reasonable basis to discredit the subjective complaints); see also SSR 96-7p, 1996 WL 374186 (S.S.A.) at 5 (July 2, 1996) (providing that assessment of the credibility of an individual's statements about pain or other symptoms and the effect the

symptoms have on his ability to function must be based on a consideration of all of the evidence in the case record, including statements regarding efforts to work).

The Court acknowledges that plaintiff has episodes of severe back pain, and is sympathetic to his complaints of chronic pain. However, plaintiff's past relevant work as an accountant is a sedentary job, and he has not established that its physical demands are any different than other sedentary activities plaintiff admitted he was capable of performing such as watching television, reading, emailing, following the stock market, paying bills, playing cards, and talking on the phone. Moreover, to the extent that plaintiff's physical activities and abilities were affected by his pain, the ALJ took them into account both in the RFC and hypothetical presented to the VE by placing limitations on his ability to bend, lift, sit, and stand and by permitting him to stand and stretch every 30 minutes. See Davis v. Apfel, 239 F .3d 962, 966. (8th Cir. 2001) ("A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ."); Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991) (finding testimony from a vocational expert, which was based on a properly phrased hypothetical question, constitutes substantial evidence supporting the ALJ's decision.).

Most importantly, there is nothing in the medical record from which the Court could conclude that plaintiff's pain affected his ability to concentrate. Simply stated, other than plaintiff's statements and his own beliefs that he had difficulty concentrating due to his pain, there is no evidence in the record to bolster his subjective complaints regarding his inability to concentrate and focus at work. Plaintiff did not inform any of his medical providers that he was having difficulty with concentration, nor does the

medical record contain any information regarding plaintiff's inability to concentrate, or the effect of plaintiff's pain on his ability to concentrate. Further, plaintiff's own activities, along with his employer's attempt to dissuade him from retiring and its offer of a promotion, are at odds with plaintiff's subjective complaints regarding his inability to concentrate.

The Court finds that the ALJ thoroughly addressed the <u>Polaski</u> factors in his determination that plaintiff's subjective complaints of inability to concentrate were inconsistent with his allegations of disability, and that the ALJ sufficiently detailed the inconsistencies and his reasons for discrediting plaintiff's testimony. Accordingly, the Court finds that the ALJ did not err in discrediting plaintiff's subjective complaints, and in denying plaintiff's application for SSI benefits.

For all of these reasons, the Court recommends that plaintiff's motion for summary judgment be denied and the Commissioner's motion for summary judgment be granted.

## **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 6] be denied; and

2.    Defendant's Motion for Summary Judgment [Docket No. 9] be granted.



Dated:        August 12, 2010

                                                *s/ Janie S. Mayeron*
                                                JANIE S. MAYERON
                                                United States Magistrate Judge

## NOTICE

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 26, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 26, 2010**.